ALTENBERND, Judge.
 

 Yolanda and Ted Rodriguez appeal a judgment entered in favor of Gideon Re-chnitz and several legal entities controlled by Mr. Rechnitz.
 
 [1]
 
 This case arises out of an unusual real estate sales and leaseback transaction in which Yolanda Rodriguez sold her home to one of Mr. Rechnitz’s legal entities when she was facing the risk of foreclosure. Although Ms. Rodriguez had substantial equity in the home, the transaction resulted in no cash payment to her. Instead, she received a lease with an option to repurchase. Without sufficient cash to pay the rent, Ms. Rodriguez was evicted from the home within a few months, resulting in the complete loss of her equity in the home. Ted Rodriguez is Ms. Rodriguez’s disabled brother. He had no ownership interest in the home. We affirm the judgment as to Ted Rodriguez without further discussion. We affirm the judgment against Ms. Rodriguez except for the portion deriving from the partial summary judgment that was entered early in this case on counts alleging fraud and a violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). We conclude that there were material issues of fact as to these claims that were unresolved at the time the trial court entered the partial summary judgment.
 

 I. The Real Estate Transaction.
 

 Ms. Rodriguez is over the age of seventy and her disabled brother is at least fifty-five. In 1996, Ms. Rodriguez purchased a home in Englewood, Florida. She and her brother lived in this home. In 2002, Ms. Rodriguez apparently refinanced this home with Brasota Mortgage Company with a balloon mortgage. As a result, she owed about $145,000 on a five-year note that came due on May 1, 2007.
 
 [2]
 
 Her
 
 *1106
 
 payments on the note were not designed to reduce the principal amount due on the note.
 

 Ms. Rodriguez allegedly made payments on this note until sometime in 2005. She then became ill and could no longer work. Her income and her brother’s disability payments were not enough to allow her to pay the mortgage, taxes, and other expenses associated with this home. Consequently, she fell behind on the note and was facing the real possibility of foreclosure by Brasota.
 

 In September 2005, she received a flyer from “Foreclosure Prevention Corp.” that urged her to call “Tom Cook” to learn how to save her home from foreclosure. In large print the flyer stated “We don’t want to buy your home ...,” which was followed by a parenthetical in small print that stated “unless you want to sell it.” The flyer made a number of representations. In response to the flyer, Ms. Rodriguez called Mr. Cook, and he came to her home on September 25, 2005. He provided Ms. Rodriguez with an explanation of the program. Within an hour, she appears to have signed a one-page “Program Outline” and a one-page “Program Understanding” as well as a purchase and sales agreement in which she agreed to sell her home to “Foreclosure Prevention Corp.” for $176,800.
 
 [3]
 
 This amount was later changed in a handwritten entry to $206,800. She agreed to sell the property “as is.” The agreement explained that she would lease the home back from the buyer for $1850 per month and that she had the option to buy back the home before October 31, 2007, for $190,000. These amounts were later changed to $1525 per month, and $282,900. Oddly, Ms. Rodriguez also signed a warranty deed that was dated September 25, 2005, conveying her home to “the Rodriguez Family Trust, Garco, Inc., Trustee, UTD.” Ms. Rodriguez’s verified complaint alleges that Mr. Cook kept the signed original copies of these agreements and did not provide copies for Ms. Rodriguez.
 

 The second page of the purchase and sales agreement contains a paragraph that provides that the buyer “may” purchase the property “subject to” the existing mortgage and appears to give the buyer the unilateral right to make that decision. Neither that paragraph nor any other provision contained within the two-page purchase and sales agreement specifically state that the buyer was, in fact, purchasing the property subject to the existing mortgage or that the seller was agreeing to sell the property without satisfaction of the existing mortgage. The other documents signed by Ms. Rodriguez during the September 25 meeting were similarly vague and ambiguous with respect to whether the buyer intended to pay off the existing mortgage.
 

 Ms. Rodriguez first met Mr. Rechnitz on October 21, 2005, when he picked her up at her home and drove her to a closing at the offices of Florida Regional Title Service. Interestingly, Mr. Rechnitz video recorded the closing, and that recording is in our record. Ms. Rodriguez says very little during the closing, but she seems to understand that she is selling her home and that she will be leasing it back with a two-year option to purchase.
 

 At the closing, Ms. Rodriguez signed another warranty deed, conveying her
 
 *1107
 
 home to “Garco, Inc., as Trustee of the Rodriguez Family Trust.” Mr. Rechnitz orally explained to Ms. Rodriguez that no member of her family would have any interest in this trust and that it was a legal entity created to allow for “investor” participation. Ms. Rodriguez signed an option to purchase real estate, giving her the right to repurchase the home for $245,000 on or before October 31, 2007. Mr. Re-chnitz signed this option on behalf of Gar-co, Inc. Ms. Rodriguez also signed an irrevocable power of attorney giving Gideon Rechnitz, individually, full authority over the home. She signed a month-to-month lease for her home, which named “Garco Property Management Co.” as the landlord. Mr. Rechnitz signed the lease on behalf of “Garco Property Management Co.,” the landlord. The lease states that the rent is due by 5 p.m. on the first of each month and that the landlord will provide no grace period. Pursuant to the lease, the tenant has the duty to maintain the property and pay for repairs to the property. However, although Mr. Re-chnitz advised Ms. Rodriguez that the home was being rented in “as-is condition” when he explained the maintenance provision to her at the closing, he added “we’re taking care of putting the new roof on and whatever pre-emptive repairs are necessary to make sure the home doesn’t fall into code violation.”
 

 Perhaps the most interesting document at the closing was a document entitled “U.S. Department of Housing and Urban Development Settlement Statement,” which was provided even though a “federally related loan” was not involved in this transaction.
 
 See
 
 12 U.S.C. § 2603(a), (b) (2005) (requiring the development of a standard real estate settlement form that must be provided to borrowers to identify all settlement or closing costs in all transactions in the United States which involve “federally related mortgage loans”).
 
 [4]
 
 The official appearing document is commonly referred to as a HUD-1 settlement statement. On the settlement statement, the “Borrower,” i.e., the buyer, appears to be paying a total of $214,520.17. Of this amount, the settlement statement is drafted as if $147,268.95 were to be paid by or on behalf of the borrower to cover the amount of the balance due on the first mortgage. The “Gross Amount due to Seller,” i.e., Ms. Rodriguez, was reduced by a comparable amount. The gross amount due to her was also reduced by $30,000 to cover the cost of the roof repair even though the written sales contract was an “as-is” transaction. This $30,000 apparently was an estimate of the amount required to reroof this average-sized home. The record contains no estimate or contract for this work, which appears to have been done only after Ms. Rodriguez was evicted.
 
 [5]
 

 
 *1108
 
 The settlement statement further reduced the payment due to Ms. Rodriguez by fees to Mr. Cook and “Profitmax, Inc.,” totaling over $6000, which fees do not appear to be authorized by the purchase and sales agreement. The settlement statement also included a charge of $14,768 for reinstatement of the first mortgage. A few more reductions were made on the settlement statement. The combined reductions in the payment due to the seller, Ms. Rodriguez, totaled $214,520.17, which was the same amount as the total to be paid by the borrower, i.e., the buyer. Ms. Rodriguez received $0 at closing.
 

 At the closing, neither Mr. Rechnitz nor any of his legal entities agreed to pay off or assume the balloon mortgage as part of this transaction. Mr. Rechnitz was only paying $14,768 to reinstate the loan. As long as Ms. Rodriguez paid her rent, Mr. Rechnitz agreed to transmit the payment of the note on her behalf from the proceeds of the rent. But Ms. Rodriguez was the only person liable to pay the $145,000 balloon note when it came due in May 2007, several months before the end of her two-year option period. Thus, to the extent that the settlement statement reflects that payment due to her from the borrower, i.e., the buyer, is reduced by the total amount of the mortgage balance and the buyer appears to pay the mortgage in the settlement statement, that statement is incongruous.
 

 Additionally, the record contains evidence that the home was worth about $387,000. This transaction took place before the recent decline in housing prices. If Ms. Rodriguez had sold this home in a standard “as-is” transaction to a bona fide purchaser for even $325,000, the mortgage would have been paid off and she would have cleared at least $120,000. Although the settlement statement makes it appear that the buyer was paying $214,520.17, Mr. Rechnitz or his legal entities appear actually to have paid approximately $30,-000 — an amount comprised of the mortgage reinstatement amount and miscellaneous expenses, including the payment of tax obligations and outstanding homeowners’ association fees — to obtain this home, subject to the $145,000 mortgage and in need of a new roof.
 

 Ms. Rodriguez had been unable to pay her mortgage before the closing. Not surprisingly, after the closing, in part because she did not receive any money in this closing, she could not pay the rent that was roughly the same as her earlier mortgage payment. She apparently sent an unsigned check to the landlord in December 2005 and never cured the default. By March 2006, she and her brother had been evicted from the home.
 

 II. The Parties.
 

 Ms. Rodriguez and her brother filed their initial complaint in this action in November 2006. As defendants they named: (1) Garco, Inc., as Trustee for the Rodriguez Family Trust; (2) Garco, Inc.; (3) Gideon Rechnitz; and (4) Garco Property Management, Inc. Thomas S. Cook was named as a defendant in the Rodriguezes’ second and third amended complaints, subsequent to the filing of the Rodriguezes’ initial and verified amended complaints.
 

 Because this transaction began with “Foreclosure Prevention Corp.,” it is helpful to know that the record reflects that a corporation named Foreclosure Prevention Corporation once existed but was apparently dissolved in 1987. When this transaction occurred, “Foreclosure Prevention Corp.” was not an active corporate entity in Florida, it was merely a registered fictitious name used by Profitmax, Inc. Gideon
 
 *1109
 
 Rechnitz is the president and sole shareholder of Profitmax, Inc. Mr. Cook is described in this case as an employee of Foreclosure Prevention Corporation, which apparently means he is employed by Pro-fitmax, Inc.
 

 Mr. Rechnitz is also the president and sole shareholder of Garco, Inc. In an affidavit filed in support of the critical motion for summary judgment, Mr. Rechnitz claims that he is the “trustee of the Rodriguez Family Trust.” This is odd because the deed to that trust states that Garco, Inc., is the trustee. He claims that he created this trust on or about October 21, 2005, for the benefit of Rental Acquisitions, LLC, a Florida limited liability company for which he is the managing member. The record contains a copy of a written trust agreement in which Garco, Inc., is named as the trustee.
 

 Garco Property Management, Inc., is alleged to be another corporation controlled by Mr. Rechnitz.
 

 III. The Partial Summary Judgment.
 

 Ms. Rodriguez and her brother filed a verified amended complaint in early 2007, which contained eleven counts. The defendants filed a motion to dismiss. While their motion to dismiss was pending, the defendants also filed a motion for partial summary judgment. This motion sought summary judgment on most of count one, on counts two through nine, and to all claims by Ted Rodriguez. As to count seven, which alleged a theory under FDUTPA, and count eight, which alleged fraud, the motion is not detailed and relies primarily, if not exclusively, on the fact that at the closing Ms. Rodriguez was aware that she was selling her home.
 

 This ground would appear to be well taken to the extent that the verified amended complaint alleges that Ms. Rodriguez was unaware that she was selling her home. However, this is not the only misrepresentation alleged in the verified amended complaint. Among other things, the verified amended complaint also alleges misrepresentations concerning the financial descriptions on the HUD-1 settlement statement. It further alleges that Ms. Rodriguez’s home was actually worth $387,000 and that the defendants misrepresented the nature and details of this transaction in order to obtain the equity in her home without fair compensation. Whether Ms. Rodriguez understood that she was selling her home was not disposi-tive of these other allegations.
 

 The verified amended complaint sufficiently alleges each of the essential elements to state a cause of action for the claims in counts seven and eight, and the defendants failed to establish that they were entitled to summary judgment as a matter of law. They failed to prove the absence of any genuine issue of material fact.
 
 See, e.g., Holl v. Talcott,
 
 191 So.2d 40, 43 (Fla.1966) (reiterating the principle that the burden of proving the absence of a genuine issue of material fact is upon the moving party). As framed and presented, the defendants’ motion for partial summary judgment simply did not address the combination of allegations that were sufficient to state these causes of action. Inasmuch as material issues of fact on these claims were unresolved, the trial court erred in entering partial summary judgment on counts seven and eight of the verified amended complaint. Although this error has led us to conclude that the judgments must be reversed as to Ms. Rodriguez’s claims on these two counts, we decline to create extensive law of the case in light of the limited grounds for partial summary judgment raised by the defendants.
 

 In closing, we note that while this case was pending on appeal, another panel of this court affirmed a judgment against Mr.
 
 *1110
 
 Rechnitz and several of his corporations for a similar transaction that also occurred in Sarasota County.
 
 Rechnitz v. Costa,
 
 59 So.3d 1144 (Fla. 2d DCA 2011) (table decision). Although this court did not issue an opinion in that case, our record reflects that the jury returned an award in favor of the plaintiff under FDUTPA.
 

 We affirm on all issues raised by the Rodriguezes in this appeal except those related to counts seven and eight of the verified amended complaint, upon which we reverse and remand for further proceedings as to Ms. Rodriguez.
 

 Affirmed in part, reversed in part, and remanded.
 

 NORTHCUTT and BLACK, JJ„ Concur.
 

 [1]
 

 . The judgment was also entered in favor of Thomas S. Cook on counts ten, eleven, and twelve. In this appeal, the Rodriguezes take issue with the judgment entered in favor of Mr. Cook as to count twelve only. We affirm the judgment as to Thomas S. Cook on count twelve without further discussion.
 

 [2]
 

 . The total amount owed on this balloon promissory note varies a few thousand dollars
 
 *1106
 
 throughout the course of these events. This opinion uses $145,000 as an approximate number that is adequate to tell the story.
 

 [3]
 

 . The verified amended complaint discussed later in this opinion alleges that some documents were fraudulently back dated. For purposes of this opinion, the dates we mention are not intended to be conclusive.
 

 [4]
 

 . This transaction also occurred before the October 1, 2008, effective date of section 501.1377, Florida Statutes (2008), that provides consumer protection for foreclosure-rescue transactions involving a lease option or other repurchase agreement between an equity purchaser and a homeowner and creates a rebuttable presumption between the equity purchaser and the homeowner that "[a]ny foreclosure-rescue transaction involving a lease option or other repurchase agreement ... is a loan transaction and the conveyance from the homeowner to the equity purchaser is a mortgage under s. 697.01.” Section 501.1377 contains numerous compliance requirements, including a provision that “[a] foreclosure-rescue transaction agreement must comply with all applicable provisions of 15 U.S.C. ss. 1601 et seq. and related regulations” — the provisions which govern federal consumer credit protection, including truth in lending. § 501.1377(5)(a)(4). We do not address whether a HUD-1 settlement statement must be used for transactions that fall within the purview of section 501.1377.
 

 [5]
 

 . We are not suggesting that the cost of the roof repair could not have been an adjustment to the repurchase price in the option. However, nothing in the purchase and sales
 
 *1108
 
 agreement would appear to allow for this reduction at closing.